Mr. Davis. Yes, Your Honor, thank you. My name is Matt Davis and I represent Harry Dapron in this matter. This is an ERISA case for disability benefits where the plan administrator refused to evaluate the claimant's relevant evidence that he submitted to support his claim for disability. Following that, to support their denial and refusal to ignore that relevant evidence, the plan created a new justification in litigation than they had previously in the denials of benefits. That is a post hoc rationale and is not allowed under ERISA. To begin with our first point as to why it was absolutely necessary for the plan to review and consider the 1800 pages of medical records submitted to support the disability, it's very clear under ERISA and a fundamental tenant of the rules that govern the ERISA process under the statute, under the regulations implementing the statute, and in this case even under the clear language of the plan, when a claim is denied and a claimant provides information to support the claim, it is absolutely the duty of the plan administrator to review that evidence. What about the ruling that it was untimely? The ruling that it was untimely, we believe, is a post hoc rationale. There were two different reasons given in the initial denial letters. At first, the language in the initial denial letter said that the retirement committee was interpreting the plan to say that there had to be an application before slash in connection with the end of employment. Is that not a timeliness decision? Well, it's not a hard and fast deadline and the plan does not contain a hard and fast deadline. So that initial denial simply said that we think that the plan says before slash in connection with. But clearly, I mean, six years does not fall within that standard either, does it? Well, we think it does, Your Honor, because the way we interpreted in connection with, with the rest of that denial letter saying, hey, but send us your evidence, we'll read it, which they didn't do. In connection with simply means that the reason you stopped working was because you were disabled. And if you can prove that, then. No matter how many years or decades take place? There is no deadline in the plan. There's simply no deadline in the plan. And in this case, the medical evidence, it's a, it's a, it's a very unusual case. But the medical evidence shows clearly that prior to ending his employment relationship with, at that time with Cleve, all the through the way that, all through the time that he applied for the disability, he was fundamentally disabled. And that's from the Social Security Administration. Not only from the Social Security Administration, who had no problem finding years later that he was disabled as of February 2010, which was prior to his last day of employment. But as we go, you know, we submitted voluminous medical records. There was a lot of interactions with medical personnel that documented the very serious mental issues that Mr. Dapron was experiencing at that time. And it is a sympathetic case. It did sound like he was suffering from some significant problems from those records. But under the plan, wouldn't Laclede, don't they reserve the opportunity to do their own assessment to determine whether or not he was disabled? And that's part of the, at or around the time of the, his quitting? I would argue they not only have the right to do that assessment, they have the obligation to do that assessment. And the problem with this case is they didn't do that assessment. They just simply refused to look at any of the medical records. And that's not in dispute. They just simply said, this is too late, we're not going to look at this and try to figure out whether or not we can determine whether or not he was disabled at the time that he was terminated. And that was in the second denial letter. The second denial letter, they changed the before in connection with, and they changed it to at or, you had to apply at or around the time that you were terminated. And then they went on to explain the rationale why. And the rationale given in that second denial letter was exactly as you said. Because we think it would be too hard to figure out whether or not somebody was disabled when they were terminated in employment six years later. And then the second problem under the plan, or if we could find some other employment for them at the company. But in this case, we think that those records would overwhelmingly demonstrate that not only does the medical show that if they had looked at it, that he was disabled prior to terminating. He had continued to be disabled. Was completely unemployable. He could barely maintain activities of daily living. He was off the grid for a long time. And that's in the records. All that, but those medical records also show that Laclede was clearly on notice at the time of his termination, the serious medical conditions that he had suffered. In fact, after he left employment, he was involuntarily committed at St. Anthony's Hospital in a psychiatric unit. In the medical records, which we submitted, which they ignored, there was documentation of the hospital personnel and the human resources department at Laclede talking about, is there a job? Can he come back? There's questions about that. And in those records, the medical personnel said Laclede was well, said they were well aware of him. They even said it went all the way to the president of the company. That they were sympathetic with him, but they don't think there's anything they can do. Would that hospital worker have been someone who could have acted on his behalf? It sounds like he was not in a position to figure out disability, future disability payments for himself at that point. Was there anyone who was either a guardian or someone who could have been appointed through the hospital or could have been his representative? I don't know, Judge. I mean, I think the plan would have allowed that, but that would take into account that they would have to be aware of the fact that these benefits were available. And I think that the medical records kind of show that that was not certainly on Mr. Dapron's mind at that point. I mean, he was under serious paranoid hallucinations. And it didn't occur to him until he finally got stabilized with treatment and had a social worker where he was on social security. And then it occurred to him, well, I also think I have disability benefit pensions. So, you know, it's a sympathetic case, but we're not looking for sympathy. We're simply looking for the rights that were promised to him in the plan, in the denial letters, that they examine this information. And also, you know, what he had earned for working for 20 years. And, you know, to go to our second point of the post hoc rationale, and I think it's an important point, the first denial letter said interconnection. That's what they thought the plan said. They're not citing, quoting the plan. That's what they're interpreting the language to be. The second one was at or around the time, because that's important for us to know if we can determine whether or not someone was disabled when they stopped. But then in litigation, they came up and said, well, no, there actually is a hard and fast deadline. They said that there's actually 30 days prior to your termination, you had to apply for benefits. That was something that was never brought up before. It's our position that that language is actually borrowed from the retirement section, because it's a pension plan. It has retirement benefits and disability benefits. And it's completely unworkable. There would be no way in most situations where someone would know 30 days prior to becoming disabled that they were going to have to stop work. If Mr. Dapron left work, was in a car wreck, and then was in a coma for two years, there's no way that he would have known 30 days prior to him stopping work that that was going to happen. Are you making the argument that these contacts between the hospital and McLeed, where they're basically saying this guy's been involuntarily committed, probably can't come back to work, that that somehow or the other is an informal, or that that in and of itself constitutes an application, or that the company had some duty to do something at that point to begin processing disability? No, Your Honor. What we're saying is that that was evidence we submitted to the plan administrator. So when they come back and say, well, what we need to do is to look and see if we can determine whether or not at the time that you were terminated, you were disabled and we had no other work for you, they're saying, well, we can't do that six years later because there's no way to know. And we submitted information to them and said, well, yeah, you could, because you knew back then, it's in the records, and we have records to show that he was completely unemployable for all these years. I should also point out, the plan does have language in there that talks about a process, that if McLeed, the retirement board can't determine the medical, they have a process to go to outside physicians. They didn't follow that process because they never looked at the medical. So all we're asking is for the process to be followed, for them to follow the regulations, follow the plan, to look at the medical, to send it to the outside experts and see if they can, in fact, determine whether or not he was disabled, whether that was the cause of his termination, and whether or not there was any work available in 2010. Thank you. Mr. Potler? Good morning. May it please the Court, my name is Rick Potler. I am from the law firm of Thompson Colbert here in St. Louis, and today I have the privilege of representing the Appalachians. What's your response to the last point that was raised about the 30-day requirement is a new rationale that would be totally unworkable? How would you know you're going to be in a catastrophic automobile accident in 30 days? Now, that's something you just made up out of whole cloth for briefing purposes. Your Honor, this is not a disability plan. This is a pension plan that provides a disability. Well, how do you answer the question, though? How do you know 30 days before that you're going to be in an accident? It's 30 days from the date you're going to stop employment. You can be in an automobile accident and you could be paralyzed. You're still an employee. You're still getting paid. You're still getting disability benefits. You're still getting life insurance. You're getting all of those benefits. All we're saying is that if you want to stop your employment, just like we tell people, you're going to retire, you've got to tell us a little bit in advance. You can't just show up one day and say, you know, I retire. Do you have anything in the record that shows that that was a justification that was made prior to litigation? Your Honor, we told him from day one your claim is untimely because it has to be filed at the beginning of your separation of employment. You said at or around the time you left. That's right. 30 days isn't around. Well, I suppose 30 days is around before, but around could be also 30 days after. Your Honor, you could, but that's an academic point because we're six years here. And so we've always said, and to say that he didn't understand that it was a timely issue, look at the appeal he filed. Twice he said, you denied this claim because it was untimely. So he fully understood that this was a timeliness issue. And that was the issue our committee had to first decide. It had to read the plan and say, is there a time limit when you have to file a claim? And we said, yes, and it certainly isn't six years. And then we said, we've looked at the plan document, we've looked at the SPD, we've looked at the history of plan administration, and consistently this is the way this plan has been administered. And, Your Honor, this court, because the plan grants the discretion to this committee, can reverse that decision only if it was arbitrary and capricious. And here's the two important points here. The plaintiff or the appellant in his briefs and even in his argument today has never once argued that our interpretation of this plan was arbitrary and capricious. In fact, he's never even argued that it was incorrect. He's never presented either to the district court or to this court an alternative interpretation of this plan that says you can submit a plan six years after you have separated from employment. Was the company aware of his disability around the time of his termination of employment? The record would suggest that the hospital says it called people at Laclede and said he was having difficulty. And as I understand it, the plan allows the company to submit this application for benefits on his behalf. Is that correct? I think it says that a representative or a family member may. But I suppose your argument then it wasn't arbitrary and capricious not to do that or there was no duty to do that? Well, first of all, there's never been a claim that there was a duty to do that. That's not a claim that has been asserted in this lawsuit. And Magistrate Bodenhausen made that specific point in his order. And so any such claim would be barred by limitations in any event. And I can tell you, Your Honor, I've counseled ERISA plans for almost 40 years. When you start taking action on behalf of participants, you inevitably get sued because you didn't give them the right advice. You told them to take a joint and survivor annuity, and they should have taken a lump sum. You told them they ought to wait for the early retirement program, and it never comes. And so I always tell my clients, don't start telling people what they ought to do and what they shouldn't do. And the law in ERISA is clear that we don't have that obligation to start providing individualized advice. So I think that there are two counts here. One is that our decision was wrong, and as I've noted, he's never presented an argument that it was arbitrary and capricious or even incorrect. The next argument is that we breached a fiduciary duty by not reading the medical records. And that's simply incorrect, Your Honor. We have an obligation to look at the evidence that relates to the issue we are supposed to decide. And the first two issues we have to decide, as an administrator, is this individual or participant an officiary such that he has standing to bring this claim? And second, is this claim timely? The plan document provides that answer to both questions. It tells you what the time limit is. And we interpreted the plan, and he doesn't say that we misinterpreted it. His medical records could not change the plan. It could not amend the plan. It could not change how the plan was to be interpreted. And he never suggests that it can. An ERISA plan has to specify in its terms how it can be amended and who can amend it. And our plan does. And as you might suggest, it doesn't say that the appellant can amend it. It doesn't say that medical records can change it. When somebody files a lawsuit in district court, what does the district court first do? Do I have subject matter jurisdiction? Do I have personal jurisdiction? Is this lawsuit timely? It doesn't read all of the evidence and make a decision on the merits when deciding those three questions. And the same was true here. We had to decide, is it timely and is he a participant? And the only document that could provide an answer to those questions was the plan document. And that's what we analyzed together with the summary plan description. And we looked at the history of interpretation and found that this was consistent. And as I've noted, the appellant never says that we were wrong on any of those accounts, much less that we were arbitrary and capricious. We didn't need to read the medical records to decide whether this claim was timely or not. We had to read the plan document because that's where the answer is. What would have been timely? The at or around the time of term? What is that? Well, first of all, I'm not on the administrative committee, so I don't have the authority to give you that interpretation. Certainly six years is. I think that as I read the plan, I would say that you need to do it by the time you walk out the door. If you come and say, you know what, my paperwork is going to be a day or two late, it's going to be a week late, it's coming, I don't know. The committee might say that's fine. But you're in the hospital, and in this particular example, with significant mental health problems without a personal representative or guardian. Does that affect the at or around time? I mean, could you submit documentation that, in essence, sort of stretched to that based on the circumstances? Well, I would say that in this instance the plan does allow for that potential because it says a family member or a representative may do so. And my understanding is that the appellant's father is the one who filed the Social Security claim for him. So his father was involved. There was family involved here. The plan doesn't give an equivalent. It doesn't say, well, you know, we're going to give more time if it's a sympathetic fact situation or under certain medical conditions. So I really can't speculate. It's hard to define when you say, oh, it's not timely. Then it sort of begs the question, what is timely? And it's, well, you're saying, well, this one clearly isn't. Well, Your Honor, the plan does say that you have to do it 30 days in advance of when you're going to start seeking the benefits. It's not 30 days in advance of when you become disabled. It's not 30 days in advance of your car accident. It's not 30 days in advance of your heart attack. It's 30 days in advance of the time when you say, I'm going to terminate my employment with the company. So I could be in the hospital and have all these circumstances, and I'm continuing to get all the benefits of employment, and then I say, all right, folks, I'm in the hospital now. I'm disabled. I'm going to go ahead and retire in 30 days. What about this situation, though, where he didn't quit? What if the company says, you're so disabled, we're firing you? So he couldn't do 30 days because he didn't think he was disabled. Well, I'm not sure that in that instance he would have said that he resigned. He didn't resign in this case. He was fired because he was disabled. No, he resigned. He voluntarily resigned. That's stipulated in the record. I thought the record said that he was fired. No, sir. He was not fired. But what if someone was terminated under Judge Malloy's scenario? Would the 30 days still apply, or is it only two resignations? Again, I'm not on the administrative committee, so I'm not authorized, don't have any authority to make that. But I would say that if you think you are disabled and you get fired, then you've got to go ahead and within 30 days submit your claim saying, no, I shouldn't have been fired. I was actually disabled. But that's not the scenario we have here, so I'm speculating on what the committee might say or do. I'm asking this because I don't know ERISA law as well as maybe I should, or I just don't know it. But there are requirements under ERISA that when a person leaves a company that they be given certain notifications of post-termination rights, and I'm thinking specifically of COBRA rights. Is there any situation that requires a person who's being either let go or voluntarily retires, who you know is probably disabled, to be told that there are certain disability benefits available to them? No, sir. We have to give him a summary plan description, which he has, and we have here. And it's his obligation, the court and the law is clear to do that. We don't have to go in and individually counsel him on what he can or might want to do. Thank you. We'd ask you, the court, to affirm the judgment. Mr. Davis, I don't think you have any rebuttal, but I'll give you a minute. No, I'll give you a minute to respond. We went a little over with your opposing case. I apologize. I just want to be very clear what remedy we're asking for. It's the same remedy we asked for the district court. We're asking for a remand back to the retirement committee to perform a full and fair review, to read the medical records, and to consistently apply the plan. Not to give us three explanations of what their interpretation is, but to consistently explain what it is, because I think that's required under King v. Hartford. We didn't argue arbitration capricious because they didn't make a decision on any merits. So they're simply interpreting plan language, and we believe that their interpretation of plan language was a post hoc rationale that they came up with this 30-day requirement, when before they told us that it simply had to be at or around the time in order to determine whether or not the person was disabled at the time, that they stopped working, and did not have any other. So your emphasis is on the reason for the at or around, not the at or around language. Because I understand you to be saying this isn't a timeliness decision. You're saying this is a reason-based decision. They told us that they needed information to determine whether or not, at or around the time that he was terminated, he could work at the company. And we believe we supplied that information. They chose to ignore it. We think the regulations require that they do that, and we're just simply asking to allow them a do-over, to remand it back to them with instructions to perform that full and fair review. Thank you. Thank you. Thank you, counsel, for your arguments today. We'll take the matter under advisement.